CHRISTOS DIMAS,           )
                              )
          Appellant,     )
                              )
          v.             )     No. 18 C 04129
                              )
GEORGE STERGIADIS,    )     Judge Edmond E. Chang
                              )
          Appellee.      )
                              )

## MEMORANDUM OPINION AND ORDER

This is a bankruptcy appeal brought by debtor Christos Dimas.[1] Dimas is challenging the bankruptcy court's decision to allow a $618,974 claim filed by his former business partner (and now creditor) George Stergiadis. The gist of the case is that Dimas and Stergiadis started a company together. Now, Stergiadis argues that he contributed much more money ($618,974 more, to be exact) to the company than Dimas, and that Dimas is obligated to pay him back. Dimas disagrees: he believes there was never any agreement to contribute equal amounts of money to the company, and even if there was, he put in his fair share and thus owes nothing.

After two days of evidentiary hearings, the bankruptcy court issued an order overruling Dimas's objection to the claim. R. 20, Appellee's Appendix at A1001.[2] A few months later, the bankruptcy court issued a separate order allowing Stergiadis

---

[1]The Court exercises subject-matter jurisdiction under 28 U.S.C. § 158(a)(1).
[2]Citations to this Court's own docket are noted as "R." followed by the docket number. For the sake of simplicity, the Court will cite to the Appellee's Appendix, rather than the original bankruptcy docket entries, to refer to documents from the bankruptcy docket.

to increase the amount of his original claim. Appendix at A1031. Dimas now appeals both orders, but for the reasons discussed below, the orders are affirmed.

## I. Background

## A. 1600 South, LLC

In 2006, Dimas, Stergiadis, and a third partner, Dean Theo, set out to open a fruit market at 1600 South Milwaukee Avenue in Libertyville, Illinois. Appendix at 1031. In connection with the project, they formed a limited liability company—which they eponymously named 1600 South, LLC—to serve as the vehicle for purchasing and managing the 1600 South real estate. *Id.* In connection with the LLC, Dimas, Stergiadis, and Theo executed an Operating Agreement. *Id.* at A0106. Under the terms of this contract, the three partners agreed to share equal membership interests, as well as equal profits and equal losses. *Id.* at A0108. What they apparently did not address explicitly, however, was the question of how they would allocate their initial capital contributions. The Operating Agreement provided space for the members to specify how much money each person would contribute to the company. *Id.* But in the final version of the agreement, those spaces were left blank, as this excerpt shows:

DEAN THEO:              $_____

GEORGE J. STERGIADIS:  $_____

CHRIS G. DIMAS:        $_____

*Id.* Nonetheless, the parties did end up making various capital contributions to 1600 South. Dimas, for his part, contributed both cash and equity. So did Stergiadis. The exact amounts are intensely disputed and will be discussed later on.

Eventually, the fruit market failed, the parties all lost their contributions, and so began the decade-long dispute about what each member owed to the others.

## B. State Court Contract Claim

In 2008, Stergiadis filed a breach of contract claim in state court naming Dimas and Theo as defendants. Appendix at A0086. In the complaint, Stergiadis alleged that "the parties agreed that they would provide equal initial capital contributions to 1600 South. However, they mistakenly neglected to include this in their written Agreement." *Id.* at A0088. According to Stergiadis, because Dimas "did not have sufficient funds or assets to provide [his] full share of the initial contributions," Stergiadis "loaned" him money to cover his "initial capital shortfalls." *Id.* at A0089. In terms of remedies, Stergiadis sought reformation of the Operating Agreement based on a theory of mutual mistake and also sought to recover the funds allegedly owed by Dimas. *Id.* at A0094-95. The state court case remains pending.

## C. Bankruptcy Proceedings

It would be natural to ask why the state case lingers on after ten years. At least part of the explanation is that the state case has been delayed several times by Dimas's bankruptcy filings. Specifically, Dimas has filed for Chapter 7 bankruptcy seven times since the state case was filed (thereby staying the state case each time). Appendix at A0283. Dimas finally received bankruptcy discharge in April 2016, on his seventh bankruptcy filing (and this present case). *Id.* at A1032.

A few months after that, however, the United States Trustee moved to reopen the case. Appendix at A0063. In the motion to reopen, the U.S. Trustee noted that

after the case had been closed, the Chapter 7 Trustee had been alerted by a creditor that Dimas had "grossly undervalued" an asset of the estate. *Id.* at A0065. In June 2016, the bankruptcy court granted the U.S. Trustee's motion and reopened the case. *Id.* at A0067.

The following month, in July 2016, Stergiadis filed a proof of claim in the amount of $488,760—the same amount that Dimas allegedly owed him for the initial capital contributions to 1600 South. Appendix at A0083. Dimas filed an objection to the claim in February 2017, which the bankruptcy court overruled on May 4, 2017. *Id.* at A0133, A0283. In that order, the bankruptcy court rejected Dimas's argument that the claim was unliquidated (because the claim was based on an unresolved state court lawsuit) and explained that it could "not state as a matter of law that the claim is not enforceable or at what amount it should be allowed and suggest[ed] that the parties return to state court to resolve the matters that court has been handling since 2008." *Id.* at A0283.

In January 2018, Dimas filed a motion to reconsider the May 2017 order. Appendix at A0288. In the motion, Dimas noted that the bankruptcy court overruled his objection without hearing any evidence. *Id.* at A0290. As a result, two evidentiary hearings were held on Dimas's motion to reconsider—the first on May 22, 2018 and the second a week later on May 29. *Id.* at A0400, A0627.

After the second evidentiary hearing (one day after, to be precise), the bankruptcy court issued an order denying Dimas's motion to reconsider. Appendix at A1001. The bankruptcy court first found that "despite the absence of equalizing

contribution language in the Operating Agreement," an equalization agreement could nonetheless be "implied in fact" based on "the facts and circumstances and expressions of a promisor." *Id.* at A1033. Specifically, the court noted that *Dimas himself* had actually scheduled a similar equal-contribution claim in one of his previous bankruptcy cases, which was evidence of a general agreement for the parties to contribute equal amounts to the company. *Id.* at A1001. The bankruptcy court then turned to the amount of the claim and ruled that it would allow a $488,760 claim. *Id.* at A1003. The court noted, however, that Stergiadis was potentially entitled to a higher claim in the amount of $618,000, but that he had not yet amended his proof of claim, so only the original proof of claim amount was being allowed. *Id.*

Stergiadis took the hint, and, in June 2018, he filed a motion to reconsider the allowance order. Appendix at A1006. In that motion, Stergiadis sought (1) to amend his proof of claim from $488,760 to $618,974 based on evidence presented at the May 2018 hearings, and (2) reconsideration of the May 2018 order to increase the allowed claim amount based on the amended proof of claim. *Id.* On October 15, 2018, the bankruptcy court granted Stergiadis's motion and allowed the claim in the higher amount of $618,974. *Id.* at A1031. At this point, Dimas filed a notice of appeal directed at both the May 2018 order and the October 2018 order.[3] R. 16-7.

---

[3]Technically, this was an amended notice of appeal. Dimas had actually filed a notice of appeal on June 12, 2018 directed only at the May 2018 order. R. 1. But because Stergiadis had filed his motion to reconsider on that same day, the appeal clock was reset, so this Court remanded Dimas's appeal back to the bankruptcy court until Stergiadis's motion to reconsider was resolved. R. 9. Following the bankruptcy court's October 2018 order, Dimas amended his original notice of appeal to also cover the October 2018 order.

## II. Standard of Review

A federal district court has jurisdiction to hear appeals from the rulings of a bankruptcy court under 28 U.S.C. § 158(a). On appeal, the district court reviews the bankruptcy court's legal findings *de novo* and its factual findings for clear error. *In re Miss. Valley Livestock, Inc.*, 745 F.3d 299, 302 (7th Cir. 2014). Under the clear-error standard, the district court will not reverse simply because it would have decided the case differently; instead, the court must ask whether, considering all of the evidence, "it is left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (cleaned up).[4]

Also, decisions left to the bankruptcy court's discretion are reviewed "only for an abuse of discretion." *Wiese v. Cmty. Bank of Cent. Wis.*, 552 F.3d 584, 588 (7th Cir. 2009). This is a difficult standard to meet—"a court abuses its discretion when its decision is premised on an incorrect legal principle or a clearly erroneous factual finding, or when the record contains no evidence on which the court rationally could have relied." *In re KMart Corp.*, 381 F.3d 709, 713 (7th Cir. 2004).

## III. Analysis

### A. Allowance of Claim

The threshold question in this appeal is whether Dimas had a contractual duty to make equal capital contributions to 1600 South. This question encompasses two separate issues. First, there is the purely legal issue of whether, given the existence

---

[4]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

of the Operating Agreement, it was proper for the bankruptcy court to look at extrinsic evidence to determine that an implied equalization agreement existed. If yes, then there is the factual issue of whether the extrinsic evidence actually supports the finding of an equalization agreement.

### 1. Whether Extrinsic Evidence Can Be Considered

Here, the bankruptcy court explained that "Stergiadis is on firm ground in asserting his claim even though the grounds for it are not specifically provided for in the parties' operating agreement." Appendix at A1001. The bankruptcy court relied on extrinsic evidence to determine that a separate equalization agreement existed outside the bounds of the contractual document. This separate agreement could have been an *express* agreement based on evidence that the parties verbally promised to equalize contributions, or it could have been an *implied* agreement "inferred from circumstantial evidence of an intent to be bound." *Century 21 Castles By King v. First Nat'l Bank*, 524 N.E.2d 1222, 1225 (Ill. App. Ct. 1988). In this case, the bankruptcy court found that there was an implied agreement.[5] *Id.* at A1002.

Under Illinois law, "an implied contract cannot coexist with an express contract on the same subject." *Maness v. Santa Fe Park Enterprises, Inc.*, 700 N.E.2d 194, 200 (Ill. 1998). Here, an express contract (the Operating Agreement) clearly exists. So, the question is whether the blank lines speak to "the same subject" as the implied

---

[5]In support, the bankruptcy court cited two cases in which Illinois courts found implied-in-fact contracts based on the behavior of the parties, as opposed to express words. *See Arthur Rubloff & Co. v. Drovers National Bank*, 400 N.E.2d 614 (Ill. App. Ct. 1980); *Foiles v. North Greene Unit District No. 3*, 633 N.E.2d 24 (Ill. App. Ct. 1994). But neither case is exactly on point because, in both, there was no written agreement at all. The difficulty in *this* case is that a written agreement does exist.

equalization agreement found by the bankruptcy court. One way of looking at this is to ask whether an implied promise "would be inconsistent with express provisions that there is no reason to set aside or to hold inoperative." *Barry Mogul & Assocs., Inc. v. Terrestris Dev. Co.*, 643 N.E.2d 245, 253 (Ill. App. Ct. 1994) (cleaned up).

Dimas argues that the Operating Agreement absolutely speaks to this precise issue—there were lines for the parties to write in how much they would each contribute, but they chose to leave those lines blank, which means they intentionally chose *not* to contribute any particular amount. R. 17, Appellant's Br. at 5. And at the very least, they never agreed to contribute *equal* amounts. Thus, argues Dimas, the bankruptcy court committed legal error when it filled in the blanks with its own equal contribution requirements. *Id.* at 8. Dimas thus asks the Court to "interpret the Operating Agreement according to the unambiguous terms contained within the four corners of the document." *Id.* at 9.

But the capital contribution provision in the Operating Agreement is not unambiguous. Dimas asserts that the blank lines clearly mean that there "was no obligation to contribute capital to the LLC." Appellant's Br. at 9. But that is too much meaning to pack into what are literally *blank* lines. It is not as if the Operating Agreement explicitly states that there was no obligation to contribute equal capital to the company. What's more, the blank lines appear in the section of the agreement that addresses "*initial* capital contributions," A0108 (emphasis added), rather than all of the contributions made by the members during the LLC's lifetime. The paragraph after the initial-contributions provision is entitled "Loans" and says that

additional contributions (in the form of loans) will be made by the members "on terms and conditions to be agreed upon by the Company and the Members." *Id.* So there is plenty of uncertainty about what obligation, if any, each member had to make contributions and in what amounts.

At the same time, it does not seem entirely fitting to call the contract ambiguous, as Stergiadis tries to do. R. 19, Appellee's Br. at 9. A contract is ambiguous when its language "is susceptible to more than one reasonable interpretation." *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 860 N.E.2d 280, 286 (Ill. App. Ct. 2006). In that case, extrinsic evidence may be introduced to resolve the ambiguity. *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). Here, however, it seems like a stretch to claim that the blank lines count as "language susceptible to more than one reasonable interpretation." That is, the blank lines cannot really be interpreted in the same way that an ambiguous word or phrase can be interpreted.[6] Indeed, all the blank lines really say is that the parties had contemplated expressing *something* about the allocation of capital contributions, but that whatever they contemplated somehow did not end up in the final version of the agreement. In this respect, looking to extrinsic evidence for a separate equalization agreement would not contradict the blank lines in the Operating Agreement.

In any event, consideration of extrinsic evidence in this case also comports with general contract principles. For instance, Dimas correctly notes that Illinois courts

---

[6]Indeed, in the original state-court contract case, Stergiadis did not try to argue that the blank lines were ambiguous. Instead, he sought reformation of the contract based on an allegation of mutual mistake in forgetting to fill in the blanks. Appendix at A0094.

will not consider extrinsic evidence beyond the four corners of a contract, Appellant's Br. at 8, but this rule only applies if the contract "contains an integration clause and is facially unambiguous." C*ity of Countryside v. City of Countryside Police Pension Bd. of Trustees*, 122 N.E.3d 297, 312 (Ill. App. Ct. 2019) (citing *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884–85 (Ill. 1999)). On the other hand, "the parol evidence rule allows extrinsic evidence of additional and consistent terms when the contract appears incomplete or ambiguous on its face." *Kay v. Prolix Packaging, Inc.*, 993 N.E.2d 39, 51 (Ill. App. Ct. 2013).

Here, the Operating Agreement is not complete. For one, the Operating Agreement does *not* contain an integration clause. Nor is there anything else in the contract to suggest that the document constitutes the entire agreement among the parties. Moreover, Dimas argues in his briefing that "there may have been a subsequent side agreement with his partners that they reimburse him" for specific legal fees that he paid for on behalf of the company (discussed in more detail below). R. 21, Appellant's Reply at 5. This further suggests that the Operating Agreement was not necessarily the final word on the allocation of capital contributions. Indeed, the "Loans" provision says that the members will *later* agree on the terms of loans made to the LLC for further capital contributions. Appendix at A0108 (loans shall be made "on terms and conditions to be agreed upon by the Company and the Members"). Thus, the bankruptcy court did not commit legal error by looking to extrinsic evidence to determine whether an implied equalization agreement existed.

## 2. What the Extrinsic Evidence Shows

Because the consideration of extrinsic evidence was not legal error, the next question is whether the bankruptcy court correctly concluded that an equalization agreement existed based on the available evidence. Because this question rests on the bankruptcy court's factual findings, the standard of review is clear error.

The bankruptcy court explained that the "problem" with Dimas's argument was that in one of his earlier bankruptcy cases, he had apparently scheduled a contribution claim against Stergiadis and Theo for $32,000 in legal fees that he paid to a law firm on behalf of the company. Appendix at A1001. Now, he was turning around and asking the bankruptcy "court to rule that the former partners did *not* owe one another an obligation to equalize amongst themselves the amounts the contributed to the project in spite of his assertion of an equalization contribution claim in his 2010 bankruptcy case." *Id.* (emphasis added).

According to Dimas, the earlier contribution claim has "no logical nexus" with the issue in this case (that is, whether the parties agreed to equalize their initial capital contributions back in 2006). Appellant's Reply at 5. Dimas notes that, for instance, he contributed a lot more money than just the $32,000 in legal fees, yet he did not try to recover any of those additional contributions during his previous bankruptcy cases. *Id.* Thus, Dimas explains, it is entirely possible that he "had some other theory for seeking recovery limited to $32,000 for the legal fees—for example, there may have been a subsequent side agreement with his partners that they reimburse him for those specific legal fees." *Id.* Of course, Dimas does not offer any

evidence of a specific side agreement limiting reimbursement to just those particular legal fees (as opposed to a broader reimbursement agreement covering all contributions); he simply hints that there *might* have been one.

It was thus perfectly reasonable for the bankruptcy court to infer that because the parties had agreed to pay Dimas back for contributing $32,000 in legal fees, then they also had an agreement to equalize and reimburse each other for capital contributions in general. To be sure, as an original, *de novo* matter, this Court might have drawn a different inference or placed a different weight on this particular piece of evidence, which appears to be the central piece of evidence relied on by the bankruptcy court. But just because "another court might weigh the evidence differently" does not mean that the bankruptcy court's finding was "clearly erroneous." *Freeland v. Enodis Corp.*, 540 F.3d 721, 735 (7th Cir. 2008). And the bankruptcy court correctly explained that an "implied in fact … contractual duty may be imposed by reason of a promissory expression which can be inferred from the facts and circumstances and expressions of a promisor." Appendix at A1001-02. Thus, the bankruptcy court's finding of the existence of an equal contribution agreement was not clear error. Stergiadis's claim against Dimas is affirmed.

## B. Amount of Claim

That being said, even if the claim is allowed, Dimas still argues that the *amount* of the claim "should be determined to be zero, or reduced substantially from the amount allowed by the bankruptcy court." Appellant's Br. at 9. According to Dimas, the bankruptcy court incorrectly "comput[ed] the relative contributions by the

Debtor and George Stergiadis to the limited liability company." *Id*. The calculation of how much each party contributed matters because the claim is based on the amount that Dimas allegedly owes Stergiadis, which is in turn based on how much Dimas contributed compared to Stergiadis.

Here, Dimas, Stergiadis, and Theo contributed a total of $2,459,072 to the 1600 South venture. Appendix at A1009. Stergiadis contributed $1,483,487, Dimas contributed $200,717, and Theo contributed $774,868. *Id*. Under an equal contribution agreement, each member should have contributed $819,691. *Id*. Thus, based on these calculations, Dimas should have contributed an additional $618,974. Hence, the bankruptcy court allowed Stergiadis's claim in the amount of $618,974.[7]

Dimas, of course, argues that he contributed way more than $200,717. (In fact, Dimas goes so far as to claim that Stergiadis might actually owe *him* money. Appellant's Br. at 16.) Dimas asserts that the bankruptcy court improperly failed to credit him for contributions that he *did* make, while also improperly crediting Stergiadis for contributions that he did *not* make. Because the calculation of the respective contributions is a purely factual inquiry, the bankruptcy court's order on this point is reviewed for clear error.

### 1. $1.2 Million Equity Contribution

First, Dimas argues that the bankruptcy court's "clearest error is in failing to include the $1.2 million equity in the 3420 W. Devon building that the Debtor

---

[7]The October 15, 2018 order does not explain the actual calculations that the bankruptcy court relied upon, but because the court ultimately adopted Stergiadis's final claim amount, it is safe to infer that the bankruptcy court adopted his underlying calculations as well, which are laid out in his briefing. Appellee's Br. at 18.

contributed." Appellant's Br. at 12. As explained next, the exclusion of this contribution is affirmed, but for somewhat different reasons than those articulated by the bankruptcy court.

To provide some background, back in 2006, the parties took out a roughly $3.7 million loan from Broadway Bank to finance the original purchase of the 1600 South property; that loan was secured with a mortgage on the 1600 South property itself. Appellant's Br. at 9-10; R. 14-12 at 47. But according to Dimas, he also pledged a piece of his personal real estate at 3420 W. Devon Street (the Devon Property) as additional collateral for that same loan. Appellant's Br. at 10. Dimas claims that the Devon Property had a net equity value of $1.2 million—it was worth $2 million but was subject to an existing mortgage of at least $800,000 with a different bank.[8] *Id.* When the fruit market ultimately failed, the bank foreclosed on the Devon Property, and Dimas lost the entire value of the property. *Id.* at 11. Yet the bankruptcy court chose not to credit Dimas for his $1.2 million contribution.

Before delving any further into the bankruptcy court's decision to exclude this contribution, it is necessary to spend some time untangling the rather convoluted series of events surrounding the Devon Property. Long story short, there are actually two entities related to the Devon Property—the Devon Property, which encompasses the actual *real estate* at the location, and the Devon Restaurant, which is the restaurant *business* that Dimas operated on the premises.[9] Appendix at A0414. When

---

[8]The first mortgage may have been as high as $874,000. Appellant's Reply at 10.

[9]To complicate things further, the Devon Restaurant was in turn operated by at least one or two additional entities. This Opinion will call them Restaurant LLC and Restaurant Corporation for the sake of simplicity. The Restaurant Corporation was 100% owned by

Dimas pledged the Devon Property as additional collateral to Broadway Bank in 2006, he was only pledging the Property, not the Restaurant. So, when the 1600 South venture failed, the bank only foreclosed on the Property, not the Restaurant. Then, in 2014, the Property was sold at a foreclosure sale to a buyer named Jimmy Boussis for a purchase price of $810,000. *Id.* at A0476. After that, Dimas no longer owned the Property. But Dimas did continue to own and operate the Restaurant on the premises of the Property. *Id.* at A0449.

Here is where things start to get a bit strange. In late 2015, Boussis entered into a contract to sell the Devon Property to a third-party buyer for a purchase price of $2 million.[10] Appendix at A0463-64, A0846. The sale closed just one month after Dimas received a discharge in bankruptcy. *Id.* at A0514, A1002. And somehow, roughly $800,000 from the $2 million in sales proceeds ended up going to Dimas (via the Devon Restaurant). *Id.* at A0466, A0520. (Coincidentally, this was around the same price at which Boussis first purchased the Devon Property at the 2014 foreclosure sale.) The exact mechanism through which the money ended up with Dimas is not clear from the record, nor does it really matter.[11] What does matter is

---

Dimas, while the Restaurant LLC was co-owned by Dimas and his wife—they each had a 50% stake. Appendix at A0071. So, when this Opinion refers to the "Devon Restaurant," it is technically referring to these entities.

[10]Strangely, Dimas's wife name appeared on the sales contract instead of Boussis's name, even though Boussis was purportedly the owner and seller of the Property. This discrepancy is never explained.

[11]It seems like what happened was that the third-party buyer paid Boussis $1.1 million and paid the Restaurant Corporation $825,000. (The rest of the $2 million presumably went to closing costs.) Indeed, based on trial testimony, it appears that Boussis was only paid around $1.1 million for the Devon Property. Appendix at A0466. As for the payment to the Restaurant Corporation, Stergiadis cites a Purchase Agreement between an entity called "3420 Devon Building LLC" and the Restaurant Corporation (owned 100% by Dimas). Appendix at A0381. According to Stergiadis, this LLC was the purchasing vehicle of the third-

that just one month after bankruptcy discharge, Dimas received a substantial chunk of money from the sale of a piece of property that he purportedly did not even own. The final straw here was that Dimas did not in any way disclose this anticipated payment in his bankruptcy schedules (he listed the value of his restaurant interests as $0, instead of $800,000).[12]

Dimas does not dispute that he ended up with roughly $800,000 of the Devon Property sales proceeds. But he maintains that there is a perfectly innocent explanation for all this. Namely, at some point during the sale, Dimas's wife apparently discovered that Boussis needed the Restaurant to vacate the Property in order to complete the sale to the third-party buyer. Appellant's Br. at 19. Sensing an opportunity to extract some cash from Boussis, Dimas's wife (who managed the Restaurant jointly with Dimas) decided to attend the closing for the Devon Property sale in order to drive "a hard bargain" with Boussis—the Restaurant would only agree to vacate the Property in exchange for some payment from Boussis. *Id*. This last-minute tactic (if that is what it was) was successful, and Boussis ended up designating $800,000 of his sale proceeds to the Restaurant. *Id*. Meanwhile, Dimas was "not even aware" that the Devon Property was being sold, that his wife was engaged in negotiations with Boussis, or that his Restaurant would be receiving a substantial

party buyer of the Devon Property. *See* Appellee's Br. at 3-4. (This LLC was not the same one owned by Dimas and his wife, which was called "3420 W. Devon, LLC.") Based on the Purchase Agreement, it looks like the third-party buyer's LLC agreed to purchase substantially all the assets of Dimas's Restaurant Corporation for a price of $825,000. Appendix at A0381. That seems to be how the $825,000 ended up in Dimas's control.

[12]In his original Schedule A/B, Dimas did not disclose his 100% interest in the Restaurant Corporation. Appendix at A0014. And although he did disclose his 50% interest in the Restaurant LLC (listed as 3420 W. Devon, LLC), he valued it at $0. *Id*.

16

chunk of the sale proceeds from the Devon Property sale. *Id.* at 20. Thus, Dimas argues, he never tried to hide anything from the bankruptcy court; he genuinely thought his assets were worth nothing.

There is, of course, a less charitable way to read this series of events—that the $800,000 belonged to Dimas all along, and he simply transferred it to Boussis for safekeeping during the pendency of his bankruptcy case, but always with the intention of recovering it immediately after receiving a bankruptcy discharge so that he could avoid listing the amount on his bankruptcy schedules. Unfortunately for Dimas, this seems to be the view at least partially adopted by the bankruptcy court, which noted that this current "claim objection is the Debtor's attempt to obtain the sale proceeds he may have concealed."[13] Appendix at 1003.

Fine, Dimas concedes, so what if he "had perpetrated a massive fraud on the bankruptcy court and bankruptcy trustee"? Appellant's Br. at 20. Even if that were true, "the bankruptcy court should not have ignored the evidence as to the actual contributions by the members of 1600 South LLC." *Id.* In particular, Dimas points to the fact that the bankruptcy court *did* credit Stergiadis for a practically identical

---

[13]Specifically, the bankruptcy court noted that "a few weeks before he filed for bankruptcy protection, a notice of sale of commercial real estate was filed involving property that he owned. The sale price was $2,000,000…the sale closed approximately a month after the discharge was entered herein. The Debtor's restaurant maintained possession of the property via a lease. The chapter 7 trustee discovered the sale and now holds the sale proceeds." Appendix at A1002-03. This description seems to conflate the Property with the Restaurant—Dimas did not own the Property when it sold for $2 million in 2015, but he did own the Restaurant that somehow ended up with a portion of the proceeds from the Property sale. *Id.* at A0504. Alternatively, perhaps the bankruptcy court believed that Dimas in fact did own the Property and had lied about not owning it. Either way, the larger point still stands—Dimas potentially concealed a large sum of money from the bankruptcy court.

equity contribution. *Id.* at 12. Like Dimas, Stergiadis also pledged a piece of property to Broadway Bank, albeit for the purpose of securing a new line of credit (as opposed to as additional collateral). *Id.* at 10. That property was worth $425,000. *Id.* at 12. Like Dimas, Stergiadis also lost the entire value of his property when the bank foreclosed on it. *Id.* at 11. But unlike Dimas, Stergiadis was credited for the full $425,000 equity value of his contribution. *Id.* at 12. According to Dimas, there was no reason to treat these two contributions differently. *Id.*

But the bankruptcy court did treat the contributions differently. Specifically, the bankruptcy court explained that Dimas "claims credit for putting his restaurant interests up as collateral even though no direct cash contributions were made from that asset to the partnership." Appendix at A1003. "In fact," the bankruptcy court noted, "the $700,000 to $800,000 being held by the chapter 7 trustee may evidence that the asset did not contribute funds to 1600 South, LLC." *Id.* Unfortunately, it is not entirely clear what the bankruptcy court meant when it said that "no direct cash contributions were made from that asset," namely, the Devon Property. (And again, just to be clear, Dimas put his *property* interest up as collateral, not his restaurant interests.) Perhaps the bankruptcy court thought that the Devon Property was merely additional collateral for an existing loan, whereas Stergiadis's property was used to secure a brand-new line of credit. *See* Appellee's Br. at 20. Or maybe it was because Dimas managed to recoup some of the value of the Devon Property from the 2016 sale, although that does not necessarily seem relevant to the narrow issue of whether he did or did not pledge a piece of property worth $1.2 million in 2006. Or

perhaps it was because of the precise amount that Dimas managed to recoup—roughly $800,000—which the bankruptcy court took to mean that the property was never worth anything beyond $800,000 (which would have just barely covered the first mortgage, thereby leaving no additional equity value to support the company).

In any event, there is a more basic reason to affirm the bankruptcy court's decision: under the clear-error standard, the bankruptcy court's assessments of witness credibility are entitled to "great deference." *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 848 (7th Cir. 2005). Indeed, the Seventh Circuit has gone so far as to explain that "a trial court's credibility determination can virtually never amount to clear error." *Id.* (cleaned up). And here, due to the series of events described above, the bankruptcy court held in no uncertain terms that Dimas "has *no credibility*." Appendix. at 1002 (emphasis added).

This is a problem for Dimas because the only basis for the original $2 million valuation of the Devon Property comes from Dimas's own testimony—which the Court must assume is not credible because of the bankruptcy court's finding. Of course, Dimas argues that even if his *testimony* was not credible, "the evidence from every other available source confirms the amount of [his] contribution." Appellant's Reply at 9. In particular, Dimas points to a loan summary purportedly prepared by Broadway Bank, which lists the "Proj. Value" of the Devon Property as $2 million, subject to an $874,000 first mortgage.[14] R. 14-13 at 4; Appellant's Reply at 9. At first glance, this loan summary appears to back up Dimas's story on this point.

---

[14]Dimas also points to a promissory note between Broadway Bank and the members of 1600 South. R. 14-13 at 1; Appellant's Reply at 9. But the promissory note only shows that

But upon closer examination, the loan summary is not as helpful to Dimas as he makes it out to be. Indeed, the bankruptcy court considered the loan summary but decided not to rely on it, albeit for seemingly unrelated reasons.[15] For one, it is actually not clear whether the $2 million projected valuation listed in the loan summary is referring solely to the value of the Devon Property, or whether it also accounts for the Devon Restaurant. For instance, the "Borrower Background" section of the loan summary notes that Dimas "is the sole owner of Whistler's Restaurant at 3420 W. Devon Avenue." R. 14-13 at 5. It is thus possible that, from the bank's perspective, the valuation listed on the loan summary encompassed some of the value of the restaurant as well. Moreover, even if the $2 million figure on the document was referring solely to the value of the Devon Property, there is still no reason to think that the estimated value was supplied by any source other than Dimas himself. That is, the document itself does not really specify where the $2 million number came from. Nor does Dimas point to any evidence of an independent appraisal.

Thus, it was not clear error for the bankruptcy court to exclude the $1.2 million equity value of the Devon Property from its calculation of Dimas's contributions.

---

the bank owned a second mortgage on the Devon Property; the document does not speak to the value of the Devon Property.

[15]The bankruptcy court disregarded the loan summary document by noting that the loan summary described the Devon Property as being worth $2 million (subject to an $874,000 mortgage), but "[t]his interest was not scheduled in this bankruptcy case." Appendix at A1003. To the extent that "this interest" refers to the property interest, it does not necessarily seem relevant, because Dimas did not own the Devon Property after it was sold at the foreclosure sale in 2014. *Id.* at A0504. So it makes sense that he would not have included the property interest on his bankruptcy schedules in this case. One possibility is that the bankruptcy court simply did not believe that Dimas had really given up ownership of the Property. But in any event, there are separate credibility reasons for excluding the loan summary evidence.

## 2. Other Cash Contributions by Dimas

Dimas also argues that the bankruptcy court improperly excluded several additional capital contributions that he made: $75,000 in fees paid to a law firm, $35,000 in loan fees to a bank, and $50,000 in financing fees.[16] Appellant's Br. at 15. According to Dimas, "there was no evidence to controvert [his] testimony" as to those contributions. *Id.* But this challenge also fails for credibility reasons because the only evidentiary support Dimas cites for these contributions is his own testimony. *Id.* So for the same reason explained above—lack of credibility—the bankruptcy court's decision to exclude these contributions is affirmed.

## 3. Cash Contributions by Stergiadis

Finally, Dimas argues that the bankruptcy court incorrectly credited Stergiadis for more than $230,000 of contributions that he did not make. Specifically, Dimas takes issue with several payments that he alleges are not supported by the documentary evidence—a $50,000 payment from March 2006; a $1,300 payment, a $40,000 payment, and a $100,000 payment, all from June 2006; and a $47,800 payment from July 2006. Appellant's Br. at 17. All of these payments were recorded in a general ledger prepared by Stergiadis's wife Katerina, who was responsible for preparing an accounting of Stergiadis's contributions to the company. *Id*; Appendix at A0535. But according to Dimas, none of these ledger entries are actually corroborated by any checks or bank deposit receipts. Appellant's Br. at 17. Rather,

---

[16]Dimas also mentions a $250,000 contribution, but he acknowledges in his briefing that Stergiadis had managed to cast doubt on whether that payment was even made on behalf of 1600 South, so Dimas is not appealing the exclusion of that particular $250,000 contribution. Appellant's Br. at 15.

the only evidentiary support for these contributions is Katerina's own testimony at the evidentiary hearing. *Id.* The fact that Katerina was unable to explain these discrepancies at the hearing, argues Dimas, "cast[s] doubt on the reliability of all the records" that she "created in an attempt to support her husband's claim in the bankruptcy." *Id.*

But once again, this boils down to the bankruptcy court's credibility determinations. Just as the bankruptcy court found Dimas to be not credible, the May 30, 2018 order clearly states that Katerina Stergiadis *was* credible. Appendix at A1002. As discussed above, the bankruptcy court's credibility finding is entitled to great deference. So is the bankruptcy court's decision to accept Katerina's testimony and records despite the absence of independent corroborating evidence. Thus, the bankruptcy court's decision to credit Stergiadis for these contributions was not clear error.

## IV. Conclusion

For the reasons discussed above, the bankruptcy court's May 30, 2018 order overruling Dimas's objection to Stergiadis's claim and October 15, 2018 order allowing Stergiadis to amend his claim are both affirmed. The status hearing of January 7, 2020 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: January 6, 2020